IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARK RANDALL HARKEN,<br><br>Defendant. | No. CR14-3028<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ISSUES PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.    DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      A.   Was the Vehicle Stop Unlawful? . . . . . . . . . . . . . . . . . . . 7
           1.   Probable Cause  . . . . . . . . . . . . . . . . . . . . . . . . . 7
           2.   Reasonable Suspicion  . . . . . . . . . . . . . . . . . . . . 11
      B.   Is the Evidence Otherwise Admissible Because of "Intervening
           Circumstances?"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.   RECOMMENDATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I. INTRODUCTION

On the 29th day of July 2014, this matter came on for hearing on the Motion to Suppress (docket number 27) filed by the Defendant on July 16, 2014. The Government was represented by Assistant United States Attorney Anthony Morfitt. Defendant Mark

Randall Harken appeared in person and was represented by his attorney, Michael K. Lahammer.

## II. PROCEDURAL HISTORY

On May 21, 2014, Defendant Mark Randall Harken was charged by Indictment with possession of firearms and ammunition by a felon and unlawful user of methamphetamine and marijuana. Defendant appeared on June 2, 2014 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on August 4, 2014.

On July 16, 2014, Defendant filed the instant motion to suppress.[1] The Government filed its resistance on July 23. Because of the pending motion, the trial was continued to September 15, 2014.

## III. ISSUES PRESENTED

Firearms were found in Defendant's possession following a traffic stop which occurred on April 11, 2014. Defendant argues the stop was violative of the Fourth Amendment and, therefore, "all evidence derived from the stop" must be suppressed. The Government denies that the stop was unlawful, and argues alternatively that even *if* the stop was unlawful, the evidence should not be suppressed "because intervening circumstances sufficiently attenuate the discovery of the evidence from the traffic stop."

---

[1] The Court notes that the motion to suppress was not timely filed. Defendant appeared and was arraigned on June 2. At that time, the Court filed a criminal trial scheduling order requiring nontrial-related motions, including motions to suppress evidence, to be filed within 28 days after the arraignment. Accordingly, the deadline for filing the instant motion was June 30. On July 9, Mr. Lahammer was retained and appeared on Defendant's behalf. Court-appointed counsel was permitted to withdraw. Without asking for an extension of the deadline for filing nontrial-related motions, Defendant filed the instant motion on July 16. The Government does not raise the timeliness issue in its resistance, however, and the Court concludes that the motion should be addressed on the merits.

## IV. RELEVANT FACTS

On April 11, 2014, Officer Cody Vry of the Aplington Police Department received a text message from Scott Schrage, Chief of Police in Parkersburg. Aplington and Parkersburg are small towns located in north central Iowa. Schrage reported that Matt Harken (who Vry believes is Defendant Mark Harken's cousin) wanted to speak with Vry. Vry and Harken then met at the City Hall in Aplington. Harken reported he had met with Defendant at around 2:00 p.m. that day, when Defendant arrived at Harken Lumber, where Matt Harken is employed.[2] Harken saw what looked like the butt of a shotgun in Defendant's black Ford-150 pickup, and mentioned it to Defendant. Defendant became angry, threatened to kill Harken, and then left the area. Harken told Vry that he later saw Defendant leaving Aplington and driving toward Parkersburg at around 5:00 p.m. After speaking with Harken, Vry called Schrage and reported the substance of his conversation. Schrage told Vry that Defendant was a felon and could not lawfully possess a firearm.

At approximately 10:40 p.m. that evening, Officer Vry was "running radar" on the east side of Applington. Vry saw Defendant coming westbound into Applington on Highway 57. Vry testified he was familiar with the vehicle and knew it was Defendant's truck. According to Vry, he noticed three violations: first, one of the lights illuminating the rear license plate was dislodged and was exhibiting a white light to the rear; second, the rear license plate was covered by dirt, making it illegible; and third, a ball hitch on the truck partially obscured the rear license plate. Vry then initiated a traffic stop.

As Officer Vry approached the vehicle, Defendant was leaning out with "the door somewhat cracked." Defendant asked Vry why he had been stopped, and Vry listed the three violations. Defendant asked if he could step out of the vehicle to look at the license plate, and Vry agreed. When exiting the vehicle, Defendant forgot to take it out of gear

---

[2] Vry testified that he believes Harken Lumber is owned by Defendant's father.

3

and popped the clutch, killing the engine. Vry testified that after looking at the license plate, Defendant agreed it was dirty and agreed that the ball hitch "was in the way." Defendant then bent down and used his hand to wipe off the plate. Defendant asked if he could turn the vehicle back on so that he could check out the light. Vry agreed, and after the engine was restarted Defendant looked at the light and "agreed it was not working right."

Defendant stated that he was on his way to his parents' house and would fix the light with glue. Officer Vry testified that Defendant's parents live about a mile-and-a-half west of Aplington. Vry told Defendant that he was not yet done with the traffic stop, and asked for permission to search inside the pickup. Vry told Defendant that he had received information there was a weapon inside the cab of the vehicle. According to Vry, Defendant's "attitude instantly changed." Defendant told Vry that the traffic stop was "bullshit" and he had no reason to stop him. Chief Schrage was already on the way toward that location, and Vry radioed Schrage that "he should continue in my direction just for safety for myself."

After Officer Vry called Chief Schrage, Defendant stated that he did not have to call for more people, and Defendant began moving toward the cab of the pickup. Vry told Defendant that he was making Vry nervous based on his attitude and, for safety reasons, Vry was going to "detain him" until he finished the traffic stop. At that point, Defendant said "fuck you, I'm leaving" and entered his vehicle.

Officer Vry reached in to grab Defendant and tried to pull him out. As soon as Vry started pulling, Defendant "came out swinging, striking me in the head and the body." Defendant's assault on Vry continued.[3] According to Vry, he was "back-peddling" to try

---

[3] Some of the encounter can be seen on a video from Officer Vry's vehicle, which was introduced as Government's Exhibit 1. The sound was not working, however, and (continued...)

4

and create separation between the two of them, but tripped on the curb. Defendant landed on top of him, continued to throw punches at Vry's head and body, put his hands in Vry's eyes, and put his hands around Vry's neck. Vry attempted to radio for assistance, but Defendant had ripped Vry's portable radio off so Vry was unable to reach it.

Eventually, Officer Vry was able to regain his feet and the altercation continued. Defendant was slammed up against his truck and fell to the ground. At that time, Vry attempted to deploy pepper spray, but the canister was knocked out of his hand. Vry was able to regain control of the canister and, when both parties stood up, Vry started to spray Defendant. The initial burst came out as a mist, and a breeze blew it back in Vry's face. After the initial burst, the canister started working properly and Vry sprayed Defendant "for a little while."

While Officer Vry was spraying, Defendant started reaching in his pockets. Vry went back to his squad car so that he could radio for assistance using his squad car radio. At that time, Vry saw Defendant had pulled out what Vry believed was a small black handgun. At that point, Vry drew his weapon and took cover. After a "short standoff," Defendant put the gun back in his pocket and headed toward the cab of his truck. With his weapon drawn, Vry ordered Defendant to get out of the truck, but Defendant drove off.

Officer Vry and other officers then pursued Defendant in a vehicle chase with speeds up to 95 miles per hour. According to Vry, authorities wanted to keep Defendant from entering his parents' home. Several officers from a variety of jurisdictions converged on Defendant's parents' house, where they found Defendant sitting in his pickup truck. Chief Schrage, who knew Defendant, attempted to "de-escalate" the situation using a

---

[3](...continued)
therefore it cannot be determined what was said.

public address system on one of the vehicles. Defendant became more agitated, however, yelling that he was a "free man" and "we may have to shoot it out." The initial standoff at Defendant's parents' house was approximately one hour fifteen minutes.

Defendant then led officers on another chase through the countryside. At one point, Defendant drove through the woods and down a ravine, causing the officers to exit their vehicles, believing that Defendant would get stopped in the woods. Officers discovered, however, that Defendant had driven through the woods and pursued him back to his parents' house.[4] While Chief Schrage distracted Defendant over the PA system, another officer was able to deploy a taser, engaging Defendant in the thigh. Defendant then "exploded out of the truck," with the taser apparently having no effect. Defendant continued to struggle as approximately five officers took him into custody.

During the struggle, Officer Vry noticed that Defendant was carrying a holster. Vry grabbed the gun (a 9 mm Beretta) from the holster and "backed away from the fight." After Defendant was taken into custody, officers searched the scene and found a black .22 Taurus handgun. Both guns were loaded. According to Vry, the .22 appeared to be the object which he had seen Defendant pull out of his pocket at the initial traffic stop. A later inventory search of Defendant's pickup revealed three rifles.

The inventory search also found items consistent with drug use. According to Deputy Trees, officers located a broken meth pipe, a marijuana pipe with burnt residue, numerous syringes, including multiple used syringes, and nine clear plastic baggies containing methamphetamine residue. Trees testified that Defendant showed signs of

---

[4] While the record is somewhat imprecise, the second chase apparently lasted about 30 minutes. Butler County Deputy Sheriff Justin Trees testified that he initially arrived at Defendant's parents' house at 11:01 p.m., and the "initial standoff" lasted approximately one hour fifteen minutes. Trees testified that after the second chase, Defendant stopped near the machine shed at approximately 12:50 a.m.

injecting on his forearm. According to Trees, "you could tell he had injected approximately six times on that line, because his skin was all bubbled up yet." Trees opined that Defendant had actually been using during the pursuit and standoffs.

## V. DISCUSSION

### A. Was the Vehicle Stop Unlawful?

Defendant argues the stop was violative of the Fourth Amendment and, therefore, "all evidence derived from the stop" must be suppressed. Specifically, Defendant argues that there was no probable cause to effect the stop. The Government argues that various traffic violations established probable cause, and there was reasonable suspicion to believe Defendant was a felon in possession of a firearm.

The law regarding vehicle stops is well-established, and was recently summarized by the Eighth Circuit Court of Appeals as follows:

> The Fourth Amendment prohibits "unreasonable searches and seizures." "A traffic stop constitutes a seizure of a vehicle's occupants, including any passengers." A traffic stop "must be supported by reasonable suspicion or probable cause." "A law enforcement officer has reasonable suspicion when the officer is aware of 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" "Any traffic violation, however minor, provides probable cause for a traffic stop." "The determination of whether probable cause," or reasonable suspicion, "existed is not made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time."

*United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012) (internal citations omitted).

### 1. Probable Cause

I will first consider whether Officer Vry had probable cause to stop Defendant's vehicle. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (*en banc*). In its

brief, the Government argues that probable cause was established by Defendant's violations of Iowa Code §§ 321.38 and 321.388.

In Iowa, the rear license plate must be illuminated with a white light, so as to "render it clearly legible from a distance of fifty feet to the rear."[5] In this case, the rear license plate of Defendant's Ford F-150 pickup was illuminated with two lights on either side of the license plate. The light to the left of the license plate was dislodged and was facing to the rear. The light on the right side of the license plate remained in place, however, and was illuminating the license plate. During cross-examination, Officer Vry conceded that the right plate light was operating properly and was illuminating the license plate. Vry agreed that § 321.388 does not require two lights to illuminate the license plate. While the testimony was somewhat imprecise, the license plate was apparently "visible" from a distance of 50 feet, although it could not be read by Vry due to dust and dirt covering the license plate. Section 321.388 requires illumination to render the light "clearly legible" from a distance of 50 feet to the rear. According to Vry, the plate was not "clearly legible," but *not* because of the failure of illumination. Rather, the problem with legibility was due to debris on the plate. It does not appear there was a violation of the illumination requirement of § 321.388.

That brings me to the Government's argument that Defendant was in violation of Iowa Code § 321.38. Iowa law requires that a license plate be positioned so that it is

---

[5] Iowa Code § 321.388 states:
> Either the rear lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear. When the rear registration plate is illuminated by an electric lamp other than the required rear lamp, the two lamps shall be turned on or off only by the same control switch at all times when headlamps are lighted.

"clearly visible," and it "be maintained free from foreign materials in a condition to be clearly legible."[6]

Officer Vry testified that the letters and numbers on the license plate were not "clearly visible" due to dirt and dust covering the plate. Government's Exhibit 3 consists of two photographs taken at the scene following Defendant's arrest. In the photographs, the numbers and letters of the license plate are clearly legible. The upper lefthand corner and the top of the plate, however, are covered by dirt. Vry testified that before Defendant wiped the plate off at the initial traffic stop, the entire plate was covered by dirt as shown in the upper lefthand corner. During cross-examination, Defendant's counsel inferred that some of the dirt may have been added during the 30-minute chase which followed the first standoff (which presumably would have required the plate to be wiped again before the photo was taken at the end of the chase). When Vry was asked by the Court whether anyone else had wiped off the plate or manipulated it in some way before the photograph was taken, Vry responded "I don't know." When Deputy Trees was asked a similar question during direct examination, he responded "not to my knowledge."

The Court found Officer Vry's testimony to be credible. That is, I believe Officer Vry that prior to the initial stop, Defendant's rear license plate was completely covered by

---

[6] Iowa Code § 321.38 states:
> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible. An imitation plate or plates imitating or purporting to imitate the official registration plate of any other state or territory of the United States or of any foreign government shall not be fastened to the vehicle.

dirt. That is, the license plate was not "maintained free from foreign materials and in a condition to be clearly legible." Accordingly, Defendant violated Iowa Code § 321.38 and there was probable cause for Vry to conduct a traffic stop. *See State v. Klinghammer*, 779 N.W.2d 495 (Table), 2010 WL 200058 (Iowa App.) (holding that snow obstructing a license plate established probable cause for a traffic stop); *State v. Miller*, 670 N.W.2d 432 (Table), 2003 WL 22015974 (Iowa App.) (holding that an obscured license plate alone furnished probable cause for a vehicle stop).[7]

Alternatively, the Government argues that Defendant violated § 321.38 because the trailer ball inserted in the bumper was in a position to render the license plate not "clearly visible." Defendant's Exhibits A, B, and C show that the ball obscures that portion of the license plate which shows the county name. In *State v. Harrison*, 846 N.W.2d 362, 363 (Iowa 2014), the Court concluded that "a license plate frame that covers up the county name violates Iowa Code § 321.37(3) and provides a valid basis for a traffic stop."[8] While *Harrison* is not directly on point, it appears to provide support for the proposition

---

[7] In *Klinghammer*, the Iowa Court of Appeals "readily acknowledge[d] that a license plate may become obstructed by such elements as snow, ice, or mud as a result of weather or road conditions." Similarly, I acknowledge that it is common for persons driving on rural Iowa roads to have their vehicles, including their rear license plate, to be covered by road dust. As noted by the *Klinghammer* Court, however, § 321.38 does not allow an exception for weather or road conditions, but instead requires that the license plate be maintained free from foreign materials and be clearly legible "at all times." The *Klinghammer* Court also noted that a license plate is the primary means by which police may identify a vehicle and its owner, and "a license plate obscured for any reason, defeats its very function."

[8] Iowa Code § 321.37(3) states:
> It is unlawful for the owner of a vehicle to place any frame around or over the registration plate which does not permit full view of all numerals and letters printed on the registration plate.

that for a license plate to be "clearly visible," *all* of the plate must be visible, including the county name. Accordingly, because the county name was not "clearly visible" due to the ball hitch inserted in the bumper, there was a violation of § 321.38.

While not argued by the parties, I believe there was also a violation of Iowa Code § 321.422.[9] Iowa law prohibits the display of a white light to the rear. In this case, the light on the left of the license plate, which was intended to illuminate the license plate, was dislodged and was facing to the rear. I believe this is a violation of § 321.422. *See United States v. Poole*, 2013 WL 1694776 (N.D. Iowa 2013) (ruling that a white light showing to the rear of the vehicle in violation of § 321.422 constituted probable cause to conduct a traffic stop).

In summary, while there was no violation of § 321.388 (requiring the license plate to be illuminated), there were two violations of § 321.38 (failing to maintain the license plate free from foreign materials and in a condition to be clearly legible, and placing a ball hitch in a position so that the entire license plate was not clearly visible), and a violation of § 321.422 (prohibiting the display of a white light to the rear). Any traffic violation, however minor, provides probable cause for a traffic stop. Accordingly, Officer Vry had probable cause to stop Defendant's vehicle and there was no Fourth Amendment violation.

### 2. Reasonable Suspicion

---

[9] Section 321.422 states:
> No person shall drive or move any vehicle or equipment upon any highway with any lamp or device thereon displaying or reflecting a red light visible from directly in front thereof. This section shall not apply to authorized emergency vehicles, or school buses and vehicles as provided in section 321.423, subsection 6. No person shall display any color or light other than red on the rear of any vehicle, except that stop lights and directional signals may be red, yellow, or amber.

Alternatively, the Government argues that Officer Vry had reasonable suspicion to believe that Defendant was a felon in unlawful possession of a firearm. Because there were multiple traffic violations providing probable cause for the traffic stop, it is unnecessary to consider the Government's alternative argument. If the district court disagrees with my analysis on the issue of probable cause, however, I will also address the issue of reasonable suspicion.

Because a traffic stop constitutes a seizure within the meaning of the Fourth Amendment, a traffic stop must be supported by at least "a reasonable, articulable suspicion that criminal activity is occurring." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (internal citations omitted). "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). In determining whether reasonable suspicion supports a *Terry*-type stop, "the standard employed is less demanding that the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (quoting *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002)).

With these general principles in mind, I turn to the facts in the instant action. At 5:10 p.m., Officer Vry received a text message from Chief Schrage, indicating that Matt Harken wanted to speak with him. After waiting for a period of time at City Hall, Vry traveled to Harken Lumber and then back to City Hall, where he eventually met with Harken. Harken reported that at around 2:00 p.m. that day, he saw Defendant at Harken Lumber. Harken told Vry that Defendant was driving his black Ford-150 pickup, and Harken saw what appeared to be the stock of a shotgun in the cab of the pickup. When Harken mentioned it to Defendant, he became angry, made threats, and drove off. Harken

said he saw Defendant drive out of Aplington toward Parkersburg at around 5:00 p.m., and that's when he called Chief Schrage.

Defendant argues that there is no reason why authorities should have considered Harken to be "a reliable witness, or that he was not under the influence of any controlled substance." In response, the Government points to the fact that Harken voluntarily contacted authorities, spoke face-to-face with Officer Vry, did not attempt to rely on anonymity, and provided detailed information regarding what Defendant was driving and where he was heading. Some of the information was subsequently verified by Officer Vry. That is, later that evening Vry saw Defendant driving his Ford F-150 pickup coming into Aplington from Parkersburg.

In determining whether an officer has reasonable suspicion to believe criminal activity may be occurring, the Court considers the totality of the circumstances. *Bell*, 480 F.3d at 863. The amount of supporting information to support a *Terry* stop, and the degree of reliability of that information, is "less demanding" than that required for a finding of probable cause governing an arrest or "full-scale" Fourth Amendment searches. *Id.* While there is no evidence that Matt Harken had provided reliable information in the past, he is clearly more reliable than an anonymous tipster. *See United States v. Kent*, 531 F.3d 642, 648-49 (8th Cir. 2008). Harken was not trying to "work off" other crimes, nor is there any evidence that he had some improper motive in contacting authorities. As noted, some of the information provided was later verified by Officer Vry. After considering the totality of the circumstances, the Court believes that Vry had "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *Hollins*, 685 F.3d at 706. Accordingly, even absent any traffic violations, reasonable suspicion would have authorized Vry to stop Defendant to determine whether he was a felon in unlawful possession of a firearm.

### B. Is the Evidence Otherwise Admissible Because of "Intervening Circumstances?"

In its final fall-back position, the Government argues that "even if the traffic stop was unlawful, no evidence of defendant's possession of firearms should be suppressed because intervening circumstances sufficiently attenuate the discovery of the evidence from the traffic stop." As set forth above, I believe that the traffic stop was authorized by probable cause that multiple traffic violations were committed, and by reasonable suspicion that Defendant was a felon in possession of a firearm. Accordingly, I do not believe it is necessary to consider the Government's additional argument. Furthermore, the Court notes that Defendant has not filed a reply brief, or otherwise responded to the Government's argument regarding intervening circumstances. Therefore, I will not give the final argument further attention, unless otherwise directed to do so by the district court.

### VI. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Motion to Suppress (docket number 27) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 29, 2014.*

DATED this 1st day of August, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA